976 F.2d 1293
 David VALLADOLID; Beatrice de La Roza, individually and on
behalf of all others similarly situated,
Plaintiffs-Appellants,
v.
CITY OF NATIONAL CITY; George M. Waters, National City
Mayor; Marion F. Cooper, National City Councilmember;
Michael R. Dalla; Jess Van Deventer; Fred Pruitt; Ione
Campbell, Defendants-Appellees.
 No. 91-56059.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted July 8, 1992.
Decided Oct. 7, 1992.
 
 Michael J. Aguirre, Aguirre & Meyer, San Diego, Cal., for plaintiffs-appellants.
 John E. McDermott, Cadwalader, Wickersham & Taft, Los Angeles, Cal., for defendants-appellees.
 Appeal from the United States District Court for the Southern District of California.
 Before: FLETCHER, O'SCANNLAIN and KLEINFELD, Circuit Judges.
 FLETCHER, Circuit Judge:
 
 
 1
 A class of Hispanic and black voting-age citizens who reside in the City of National City (the City) appeal the district court's grant of the City's motion for summary judgment. The action challenges the City's system of holding at-large elections for the selection of city council members. We affirm.
 
 I.
 
 2
 National City is a California general law city located in San Diego County. It is governed by a city council consisting of four council members and a mayor. The council members are elected at-large by the city-wide electorate. They serve four-year terms, with their terms staggered so that two council members are elected every other year. There is no majority vote requirement for election to the council. Each registered voter can vote for two candidates, but there is no prohibition against casting only a single ballot (known as "single-shot" or "bullet" voting).
 
 
 3
 In 1980, National City had a population of 48,772. 38.4% of the population was Hispanic, 8.6% was black, and 41.0% was non-Hispanic white. The remaining residents (11.9% of the population) were Asian, American Indian, or members of other racial or ethnic groups. By 1990, the City's population had grown to 54,249. 49.6% of the City's residents were Hispanic, 7.9% were black, 26.0% were non-Hispanic white, and 16.4% were Asian, American Indian, or members of other groups.
 
 
 4
 Prior to 1968, no blacks or Hispanics were elected to the city council.[1] Of the sixteen city council seats to have been contested by black or Hispanic candidates from 1968 onwards, black or Hispanic candidates have won seven. Two Hispanics currently sit on the four-member council.
 
 
 5
 The current action was commenced in 1988 on behalf of the Hispanic residents of National City. The plaintiffs claimed that the at-large system for electing city council members violated their rights under the Voting Rights Act, 42 U.S.C. § 1973, and the equal protection clause of the Fourteenth Amendment.[2] On September 30, 1988, the City moved for summary judgment. It contended that even if it adopted a system of electing council members from districts, it would not be able to create a district in which Hispanics represented a majority of the voting-age citizen population. Under the Supreme Court's decision in Thornburgh v. Gingles, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), without such a showing, a voting rights challenge to the at-large system could not be maintained.
 
 
 6
 On April 17, 1989, the district court denied the City's motion, ruling that a triable issue of fact existed as to whether the Gingles' requirement that a plaintiff class be sufficiently large and concentrated to form the majority in at least one single member district could be satisfied if the plaintiffs amended their class to include black voting-age citizens. The plaintiffs subsequently filed an amended complaint in which they sought to join black citizens in their action, and on June 6, 1989 the district court certified the current appellant class consisting of "[a]ll voting age Hispanic and Black citizens residing in National City, California."
 
 
 7
 On March 1, 1990, following the close of discovery, the City filed its second motion for summary judgment. It claimed that Gingles again required the rejection of the appellants' Voting Rights Act claims because they had failed to present any evidence that their preferred candidates usually lost council elections as a result of majority bloc voting. It also contended that the appellants' Fourteenth Amendment claims should be dismissed because no evidence had been presented that the City's at-large election system had been adopted or maintained for a discriminatory purpose. The district court granted the motion for summary judgment on May 16, 1991 and this appeal followed. We have jurisdiction pursuant to 28 U.S.C. § 1291.
 
 II.
 A.
 
 8
 We review de novo a grant of summary judgment. Lockary v. Kayfetz, 917 F.2d 1150, 1153 (9th Cir.1990); California Architectural Bldg. Prods. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir.1987), cert. denied, 484 U.S. 1006, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988). Federal Rule of Civil Procedure (Rule) 56(c) provides that summary judgment is properly granted where the pleadings and supporting materials "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Supreme Court held that "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322, 106 S.Ct. at 2552. The Court stated that the moving party's burden in such situations is simply to identify the elements of its adversary's case with respect to which it considers there to be a deficiency in proof. If the district court agrees as to the existence of the deficiency, summary judgment should follow as a matter of course. Id. at 325, 106 S.Ct. at 2553-54.[3]
 
 B.
 
 9
 Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973, proscribes practices or procedures which deny or abridge the right of citizens to vote on account of their race, color or membership in a language minority group. In City of Mobile v. Bolden, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), a plurality of the Supreme Court declared that a successful challenge to an electoral scheme could not be maintained under Section 2 absent a showing that the scheme was intentionally designed or maintained for a discriminatory purpose. Two years later, Congress responded to the Bolden decision by amending Section 2 to make it "clear that a violation [can] be proved by showing discriminatory effect alone...." Gingles, 478 U.S. at 35, 106 S.Ct. at 2758.[4] Where the members of a protected group establish that they have less opportunity to "participate in the political process and to elect representatives of their choice," 42 U.S.C. § 1973(b), than other members of the electorate because of the particular electoral mechanisms utilized by a State or locality, they need not establish discriminatory intent of the polity in adopting or maintaining those mechanisms.
 
 
 10
 Gingles represents the Supreme Court's first, and to this date its authoritative, interpretation of Section 2 in its amended form. The Gingles Court established three threshold requirements for the successful maintenance of a challenge to an at-large system of electing government officials.
 
 
 11
 First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district. If it is not, as would be the case in a substantially integrated district, the multi-member form of the district cannot be responsible for minority voters' inability to elect its candidates. Second, the minority group must be able to show that it is politically cohesive. If the minority group is not politically cohesive, it cannot be said that the selection of a multimember electoral structure thwarts distinctive minority group interests. Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it ... usually to defeat the minority's preferred candidate. In establishing this last circumstance, the minority group demonstrates that submergence in a white multimember district impedes its ability to elect its chosen representatives.
 
 
 12
 Gingles, 478 U.S. at 50-51, 106 S.Ct. at 2766-2767 (citations, footnotes, and emphasis omitted); see also Romero v. City of Pomona, 883 F.2d 1418, 1427 (9th Cir.1989) ("[P]laintiffs must meet all three [Gingles ] preconditions in order to succeed on a section 2 claim....").
 
 
 13
 With respect to the third requirement, the Gingles Court noted that "[i]t is obvious that unless minority group members experience substantial difficulty electing representatives of their choice, they cannot prove that a challenged electoral mechanism impairs their ability 'to elect.' § 2(b).... Consequently, if difficulty in electing and white bloc voting are not proved, minority voters have not established that the multimember structure interferes with their ability to elect their preferred candidates." Gingles, 478 U.S. at 48 n. 15, 106 S.Ct. at 2767 n. 15. Hence, those challenging at-large electoral systems must demonstrate the existence of "a white bloc vote that normally will defeat the combined strength of minority support plus white 'crossover votes'...." Id. at 56, 106 S.Ct. at 2769.
 
 
 14
 Here, the City moved for, and the district court granted, summary judgment on the grounds that the appellants had failed to adduce any evidence to meet this third requirement. The City contended that the appellants had not presented any proof that their preferred candidates usually lost city council elections, let alone as a result of white bloc voting. The district court properly accepted this argument.
 
 
 15
 The only analysis presented by the plaintiffs below regarding the City's elections was an expert report which examined the city council elections of 1986 and 1988 and the mayoral election of 1986. In a "Separate Statement of Undisputed Facts and Supporting Evidence" which accompanied its motion for summary judgment, the City examined the report and declared that a number of conclusions could be drawn from it. The appellants, in their "Separate Statement of Disputed and Undisputed Facts in Opposition to the Defendants' Second Motion for Summary Judgment", agreed with much of the City's analysis of their own report. In particular, the appellants conceded that the following conclusions were accurately derived from the report.
 
 
 16
 In the 1988 council election, candidates Inzunza and Van Deventer were elected. "They were the preferred candidates of the minority group and therefore the minority group elected both of its choices. White voters preferred Van Deventer and Cooper. Thus, while the minority group elected two of its candidates, white voters elected only one." (City's Statement of Fact # 9).
 
 
 17
 In the 1986 mayoral election, candidate Waters defeated candidate Van Deventer. "Van Deventer was the first choice of white voters. The minority group preferred Waters and therefore had its preferred candidate elected." (City's Statement of Fact # 13).
 
 
 18
 In the 1986 council election, candidates Pruitt and Dalla were elected. "The minority group preferred both candidates and therefore had both their first and second choices elected. White voters ranked Dalla and Ladd as their first and second choices, and Pruitt as their third. White voters therefore elected their top choice but had their second choice defeated." (City's Statement of Fact # 15). Thus, "[o]f the three elections that plaintiffs' experts studied, the minority group won each election, but white voters only won on two of five possible occasions." (City's Statement of Fact # 17).
 
 
 19
 As noted above, the appellants agreed with the City that these conclusions were properly drawn from their expert report,[5] which represented the only evidence that they produced regarding the City's elections. The appellants presented no evidence as to who the preferred candidates of Hispanic and black voters had been in city council elections prior to 1986. There thus exists no indication whether, with respect to those elections, minority-preferred candidates won or lost, or whether, to the extent that they lost, white bloc voting was responsible for their defeat. It is fair to say, then, that the appellants failed to present any evidence below that their preferred candidates usually lost city council elections as a result of white bloc voting against them. To the contrary, the only evidence presented by the appellants, that concerning the 1986 and 1988 elections, suggests that minority-preferred candidates usually won. Since the appellants failed to adduce any evidence in support of the third Gingles precondition to the successful maintenance of a voting rights claim, the district court properly granted the City's motion for summary judgment. Celotex, 477 U.S. at 322-323, 106 S.Ct. at 2552-2553.
 
 
 20
 The appellants argue, however, that minorities have long been underrepresented on the city council, and that a significant number of minority candidates have failed in their efforts to win election to that body, perhaps as the result of white bloc voting against them. Indeed, they point out, no members of a minority group sat on the council prior to 1968. However, the appellants too easily equate the presence or absence of minority individuals on the council with the victory or defeat of minority-preferred candidates. The district court simply had no information as to which candidates black and Hispanic voters had supported in elections prior to 1986 (with respect to pre-1968 elections, the district court did not even know who had run for office), and it thus had no evidence which could lead it to conclude that minority-preferred candidates usually lost races for the council.[6]
 
 
 21
 The appellants also argue that the success of minority preferred candidates in 1986 and 1988 was attributable to special circumstances and should therefore have been ignored by the district court. They look for support in this regard to the Gingles Court's assertion that "in a district where elections are shown usually to be polarized, the fact that racially polarized voting is not present in one or a few individual elections does not necessarily negate the conclusion that the district experiences legally significant bloc voting ... [T]he success of a minority candidate in a particular election does not necessarily prove that the district did not experience polarized voting in that election; special circumstances, such as the absence of an opponent, incumbency, or the utilization of bullet voting, may explain minority electoral success in a polarized contest." Gingles, 478 U.S. at 57, 106 S.Ct. at 2769.
 
 
 22
 The appellants' "special circumstances" argument is marked, however, by a fundamental flaw. Even if the district court had concluded that special circumstances accounted for the success of minority-preferred candidates in 1986 and 1988, and had accordingly disregarded the results of those elections, it would have possessed no other evidence regarding the success or failure of minority-preferred candidates in city council races. The grant of summary judgment would still have been appropriate, because the appellants would still have failed to present any evidence in support of the third Gingles' requirement. The appellants cannot salvage their case by arguing that the only proof which they presented to the district court should have been ignored.
 
 
 23
 Furthermore, none of the special circumstances mentioned by the appellants appear very significant to this case. The appellants note the Gingles Court's assertion that incumbency might explain the occasional success of minority-preferred candidates, but acknowledge that none of the minority-preferred candidates who won in 1986 or 1988 were incumbents. They also point to the Gingles Court's suggestion that pending voting rights litigation might lead majority politicians and voters to support a minority candidate in an effort to defeat the lawsuit, but acknowledge that no litigation was pending or imminent in National City in 1986 and adduce no evidence that the pendency of litigation in 1988 led to unusual support for minority-preferred candidates by whites seeking to maintain the at-large system. Finally, the appellants note that more than two white candidates ran for city council in both 1986 and 1988, and argue that majority votes were therefore split among a number of different individuals. Without this vote-splitting, the appellants suggest, the minority-preferred candidates would have lost. However, in almost every council election dating back to 1968, more than two white candidates ran for office, with four, five and even seven white candidates running in a number of elections. The "special circumstances" identified by the appellants thus do not appear so special at all, and we agree with the district court that the City was entitled to summary judgment on the appellants' Voting Rights Act claim.
 
 C.
 
 24
 The appellants alleged below that the City's at-large system for electing council members violated not only the Voting Rights Act but also the equal protection clause of the Fourteenth Amendment. "Cases charging that multimember districts unconstitutionally dilute the voting strength of racial minorities are ... subject to the standard of proof generally applicable to Equal Protection Clause cases ... [I]n order for the Equal Protection Clause to be violated, 'the invidious quality of a law claimed to be racially discriminatory must ultimately be traced to a racially discriminatory purpose.' " Rogers v. Lodge, 458 U.S. 613, 617, 102 S.Ct. 3272, 3275, 73 L.Ed.2d 1012 (1982) (quoting Washington v. Davis, 426 U.S. 229, 240, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976)).
 
 
 25
 The appellants presented no evidence below that the City's at-large system was adopted or maintained for discriminatory reasons. It is true, of course, that "discriminatory intent need not be proved by direct evidence. 'Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact ... that the law bears more heavily on one race than another.' " Rogers, 458 U.S. at 618, 102 S.Ct. at 3276 (quoting Davis, 426 U.S. at 242, 96 S.Ct. at 2049). As discussed above, however, the appellants have presented no evidence that the City's at-large system bears more heavily on Hispanics and blacks than on other voters in the City, and they have failed to point to anything else, be it in the form of direct or circumstantial evidence, which creates an inference of discriminatory intent in the City's utilization of the at-large system.
 
 
 26
 AFFIRMED.
 
 
 
 [1]
 It is unclear whether any blacks or Hispanics actually ran for office
 
 
 [2]
 The plaintiffs also claimed that the at-large system violated the Fifteenth Amendment. They have since abandoned this claim
 
 
 [3]
 The Court noted that "[a]ny potential problem with ... premature motions can be adequately dealt with under Rule 56(f), which allows a summary judgment motion to be denied, or the hearing on the motion to be continued, if the nonmoving party has not had an opportunity to make full discovery." Celotex, 477 U.S. at 326, 106 S.Ct. at 2554
 
 
 [4]
 The statute now reads as follows:
 (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or [membership in a language minority group] as provided in subsection (b) of this section.
 (b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.
 42 U.S.C. § 1973 (as amended, June 29, 1982).
 
 
 [5]
 In their "Separate Statement of Disputed and Undisputed Facts in Opposition to Defendants' Second Motion for Summary Judgment," the appellants "declare[d] that the following facts as described by defendants are undisputed in this case: ... numbers 1, 2, 3, 4, 5, 6, 8, 9, 10, 11, 12, 13, 15, 16, 17, 18, 19, 20, and 21." (emphasis added)
 
 
 [6]
 The appellants did not claim below that they had insufficient time to engage in discovery or to prepare their proof